1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Petitioner,<br><br>  v.<br><br>ANTHONY RAYMOND DODD,<br><br>    Respondent. | CASE NO. 24-cr-078-JHC<br><br>ORDER DENYING DEFENDANT'S<br>MOTION TO SUPPRESS EVIDENCE |

# I

## INTRODUCTION

This matter comes before the Court on Defendant Anthony Raymond Dodd's[1] Motion to Suppress. Dkt. # 41. Dodd contends that evidence obtained from a car, apartment, and cell phone must be suppressed because the attendant searches were unlawful. The Court has reviewed the materials filed in support of and in opposition to the motion, the rest of the case file, and the governing law. The Court has also considered the arguments by the parties and evidence presented at the hearing on April 21–22, 2025. Dkt. ## 62, 64. Being fully advised, the Court DENIES the motion.

---

[1] Dodd legally changed his name to Marche Pharaoh Dodd on June 4, 2021. Dkt. # 50-4 at 2.

ORDER DENYING DEFENDANT'S MOTION TO
SUPPRESS EVIDENCE - 1

**II**

**BACKGROUND**[2]

A.      Dodd's Background and Supervised Release Conditions[3]

In August 2009, Defendant Anthony Raymond Dodd pleaded guilty to the crimes of indecent liberties by forcible compulsion, robbery in the first degree, unlawful imprisonment, and residential burglary.  Dkt. # 50-1 at 25.  He used a handgun in the commission of these offenses.  *Id.* at 5.  Two days after pleading guilty, he was sentenced to an indeterminate sentence of 171 months to life and community custody.  *Id.* at 29.

In November 2021, Dodd was released from prison by the Indeterminate Sentence Review Board (ISRB) to a term of lifetime community custody supervision.  Dkt. # 50-2 at 2. Dodd's release to community custody was subject to several conditions, including:

- He was required to register as a sex offender.
- He was required to report as directed within one business day to any person designated by the Department of Corrections (DOC).
- He was required to "obey all laws and courts orders," including the conditions imposed by the ISRB.
- He was prohibited from owning, possessing, or transporting a firearm or ammunition.
- He was required to "submit to a search of [his] person, residence, vehicle and/or possessions when requested when requested" and this requirement extended to his "computer, cell phone and any other electronic device."
- DOC officers were allowed to perform "home visits to monitor compliance with supervision."

---

[2] Federal Rule of Criminal Procedure 12(d) provides, "When factual issues are involved in deciding a motion, the court must state its essential findings on the record."  "This requirement is mandatory."  *United States v. Martinez*, 2023 WL 3220906, at *1 (9th Cir. May 3, 2023) (citing *United States v. Prieto-Villa*, 910 F.2d 601, 610 (9th Cir. 1990)).  The facts presented in this section are based on the officers' reports, credible testimony at the April 21 and 22 evidentiary hearings, and the admitted exhibits, and are the Court's essential findings.  These findings are supported by a preponderance of the evidence; that is, the evidence establishes "the relevant fact is more likely true than not."  *See United States v. Castro-Hernandez*, 258 F.3d 1057, 1059 (9th Cir. 2001) (quoting *United States v. Collins,* 109 F.3d 1413, 1420 (9th Cir. 1997)); *United States v. Holmes*, 129 F.4th 636, 657 (9th Cir. 2025) ("Where a preliminary question turns on a question of fact, it must be established by a preponderance of the evidence, and the district court's fact-finding on that question is subject to clear error review.").

[3] This order uses the terms "supervised release" and "community custody" interchangeably as do the parties.  *See* Dkt. # 41 at 7; Dkt. # 50 at 6, 12.

- He was required to live at a location approved in advance by the DOC and these living arrangements could not be changed without prior approval.
- He was required to submit to a polygraph examination to verify compliance with his release conditions. Attempts to use countermeasures during an exam, as determined by the polygraph examiner, could "result in sanctions."

*Id.* at 2–3. If Dodd violated any of these conditions, the ISRB could issue an order for his arrest and detention. *Id.* at 2. After a review of an alleged violation, the ISRB could revoke Dodd's release to community custody. *Id.*

During his first two years on supervised release, Dodd violated these conditions four times. Dkt. # 50-3 at 2. He consumed cocaine twice, provided a diluted urine sample, and failed to report when requested. *Id.*

B.    Events Leading to First Polygraph

Community Corrections Office (CCO) Mary Bullard was put in charge of Dodd's supervision in January 2024. Dkt. # 50-4 at 2. Bullard met with Dodd that month to review the conditions of his supervised release with him. *Id.* at 2-3. She also spoke with Nicholas Nasca, the CCO assigned before to Dodd's case, and learned that Dodd was scheduled to take a maintenance polygraph to monitor compliance with the conditions of his supervision on February 15, 2024. *Id.* at 2, 10.

A short time later, the King County Sheriff's Office Registered Sex Offender Unit sent Bullard a tip they had received about Dodd. *Id.* at 3. The tipster was anonymous. *Id.* They alleged that Dodd "is an aggressive pimp that sells major drugs, such as fentanyl pills and cocaine" and that Dodd "carr[ie]s guns multiple at a time." Dkt. # 41-2 at 2. The tip accurately provided Dodd's name, location, and Facebook and Snapchat usernames, and it recognized Dodd's status as a registered sex offender. *Id.*; Dkt. # 50-4 at 3.

To verify that Dodd was not violating the terms of his supervised release, Bullard sought to confirm that Dodd resided at the address he provided to the DOC. Dkt. # 50-4 at 4. About a month after taking over Dodd's case, Bullard and Nasca went to Dodd's reported address but they could not access the floor of his unit. *Id.* After speaking with the building's leasing agent, Bullard learned that the unit was leased by a "Michael Dodd." *Id.* The leasing agent then gave Bullard and Nasca access to Dodd's floor. *Id.* When they knocked on Dodd's door, no one answered. *Id.* Early the next morning, Bullard again visited Dodd's reported residence. *Id.* This time she came with a different DOC employee. *Id.*; Dkt. # 62 at 97:15–21. There was no response when Bullard knocked on Dodd's door around 7 a.m., so she called his phone number. Dkt. # 50-4 at 4. Dodd did not answer her call, but he texted her back a few minutes later and informed her that he was 25 minutes away. *Id.* Bullard let Dodd know that she was trying to verify his address and instructed him to report to the Seattle Metro Police Unit. *Id.* at 4–5.

Later that day, Dodd failed to report as instructed by Bullard. *Id.* 5. So Bullard began the process of issuing a warrant for his arrest. *Id.* at 4. As part of this process, she confirmed that Dodd was not in custody or the hospital and that no new criminal charges had been filed against him. *Id.* She also contacted the DOC Warrant Desk to see if a different address was linked to his reported vehicle, a black Chrysler 300. *Id.* She learned the vehicle was not registered in his name and had been impounded. *Id.*

A week later, Bullard texted Dodd to remind him about his scheduled maintenance polygraph. *Id.* at 5. Dodd responded by both text and phone call, and he informed Bullard that he was at home and would be at the exam. *Id.* Because Dodd responded to Bullard's message, she cancelled the outstanding warrant for his arrest. *Id.* The same day, Bullard and Nasca went to Dodd's reported residence around 10 a.m. but Dodd was not there. *Id.* After Bullard contacted him, Dodd arrived at the apartment about 20 minutes later. *Id.* Bullard toured the

apartment and noted there were no sheets on the bed even though Dodd said he had been home earlier. *Id.* And as Bullard and Nasca left the neighborhood, they saw Dodd running down the street. *Id.* This stood out to Bullard because Dodd said that he had a parking space in the garage under his apartment building. *Id.*

C.    The First Polygraph

On February 15, Dodd was running late for his maintenance polygraph. *Id.* at 5–6. When the building's receptionist did not notify Bullard that Dodd had checked in for his exam, she went to see if he was in the lobby area. *Id.* She then saw him running through the parking lot out of the window and on the building's security cameras. *Id.* at 6; Dkt. # 62 at 59:2–5. Because Dodd was late but still did not use one of the open parking spots in front of the building or any of the available street parking, Bullard grew concerned that he was hiding a vehicle. *Id.* During the polygraph, Dodd was asked several questions about conduct that would have violated the conditions of his supervised release, including: (1) "if he had sexual contact with anyone other than his approved romantic partner"; (2) "if he handled or possessed firearms"; and (3) "if he had stayed at any unapproved location." *Id.* The polygraph examiner reported the results were inconclusive, but he noticed that Dodd "kept moving around" and he told Bullard, in his professional opinion, Dodd "used countermeasures" and was "manipulating his breathing." *Id.*; Dkt. # 50-3 at 3. The examiner's written report says Dodd "exhibited consistent change in his breathing patterns and movement. This behavior is commonly seen in individuals who attempt to manipulate the results. I confronted him a number of times about his breathing and movements and asked him to stop. In my opinion, he was intentionally trying to change the results." Dkt. # 50-3 at 3.

When Bullard confronted Dodd about this, he said the nature of the interview and the voice of the examiner caused the inconclusive results. Dkt. # 50-4 at 6. He also said the

questions were disarming because they had nothing to do with his case. *Id.* Bullard informed

him that these were standard questions that addressed the conditions of his supervised release.

*Id.* She then scheduled Dodd to take another polygraph at her office a week later. *Id.*

D.    Events Leading to Second Polygraph

Based on Bullard's concern that Dodd was hiding a vehicle, CCOs were stationed several

blocks from the DOC office where Dodd's second polygraph was scheduled to take place. *Id.* at

7. One of these CCOs was Matthew Tewolde;[4] Tewolde had met Dodd in person several times,

and he was familiar with Dodd's appearance. *Id.*; Dkt. # 50-7 at 2; Dkt. # 64 at 4:10–14.

Around 20 minutes before Dodd was scheduled to arrive for his second polygraph on

February 22, Tewolde parked his state vehicle at a fast-food restaurant near the DOC office.

Dkt. # 50-7 at 2. He then saw a gold Chevrolet Malibu park at the restaurant and he was "sure"

that Dodd was the driver. *Id.*; *see* Dkt. # 64 at 12:21–13:10. The only car that Tewolde took

surveillance pictures of was the Malibu and he watched it leave the parking lot.[5] Dkt. # 50-7 at

2–4.

A few minutes later, Nasca called Tewolde and said that Dodd had arrived at the DOC

office "out of breath like he was running." *Id.* at 2. Tewolde told Nasca that he had seen Dodd

wearing a black jacket and Nasca confirmed this. Dkt. # 64 at 14:16–15:9. Tewolde also gave

the license plate number of the Malibu to other officers. *Id.*; Dkt. # 64 at 31:2–21. He then

drove in the direction that he saw the Malibu leave the restaurant parking lot, and he located the

---

[4] The other officer present, Paul King, offers a version of events that in some ways conflicts with
Officer Tewolde's account. But the Court does not credit King's version because he was still in training
on that day, he served as a CCO for only about six months, and his written statement was not taken until
nearly a year after Dodd was arrested and searched. Dkt. # 62 at 4:25–5:1, 7:22–8:4; Dkt. # 50-9. The
Court also found King to be a less reliable witness than Tewolde during the evidentiary hearing. For
example, he paused before answering some questions in a manner that appeared to suggest he was
struggling to remember the events at issue.
[5] These pictures do not capture Dodd driving the Malibu or the license plate. Dkt. # 50-7 at 2–4.

car a few blocks away, parked along the back wall of a nearby business. Dkt. # 50-7 at 2. Officers never saw Dodd exit the Malibu, but they monitored the car during the polygraph to ensure no one else entered or exited the vehicle. *Id.*; Dkt. # 64 at 14:5–10.

E.    The Second Polygraph

Dodd was again running late for his second polygraph. Dkt. # 50-4 at 7. And once again, Bullard saw Dodd from her window running towards the DOC office to make it to his exam. *Id.*

At this exam, Dodd was asked similar questions about possessing and handling firearms, sexual contact with anyone other than his approved romantic partner, and spending the night anywhere other than his approved residence. *Id.* at 7–8. After the test, the polygraph examiner told Bullard that deception was shown in response to these questions. *Id.* at 7–8. And he described the reaction to the question about firearms as "strong." *Id.* at 8. An arrest team was then gathered and Dodd was detained in the DOC office for "failing to abide by polygraph examination by using countermeasures" during his first polygraph test. Dkt. # 50-10 at 2.

F.    Searches

After Dodd was detained, CCO Shane Ransone performed a pat search and issued *Miranda* warnings. *Id.* Officers found a lanyard with two key fobs during the pat search, and they informed Dodd that they planned to search his vehicle. *Id.*; Dkt. # 50-4 at 11. Dodd and the officers then drove to the location of the Malibu and Ransone used one of the key fobs he found on Dodd to enter the car. Dkt. # 50-4 at 11. Ransone opened the car's center console and found a handgun and two clear bags of blue pills. Dkt. # 50-10 at 2–3. The pills were labeled "M30" and suspected to be fentanyl. *Id.* When the pills were later field tested, they tested positive for fentanyl. *Id.* at 3.

Officers "approved and conducted" the search of the car based on Bullard's "reasonable cause that Mr. Dodd was in violation of the conditions of community custody." Dkt. # 50-4 at 8.

ORDER DENYING DEFENDANT'S MOTION TO
SUPPRESS EVIDENCE - 7

Bullard's reasonable cause was specifically based on "information from the polygraph examinations," "the information the tipster had provided regarding Mr. Dodd's social media has been verified," "Mr. Dodd's history of committing violent crimes involving firearms and controlled substances," and her "interactions with and observations of Mr. Dodd since assuming responsibility for his case[.]" *Id.*

After the search of the Malibu, officers gathered to search Dodd's apartment. Dkt. # 50-10 at 2. In the right corner of Dodd's living room, officers noticed there was a vent with a loose screw. *Id.* When officers searched behind the vent, they located "3 loose blue 'M30' suspected Fentanyl pills in addition to some jewelry." *Id.* They also located $1,460 in cash on the living room table. *Id.*

Bullard later transported Dodd to jail "for violations of the conditions of his supervision." Dkt. # 50-4 at 11. She asked him for the password to the cellphone in his possession when he was arrested, but he refused to provide it. Dkt. # 50-3 at 5. When Bullard returned to her office, she placed the cellphone into evidence. Dkt. # 50-4 at 11. She observed missed calls and text messages were being received and were visible. Dkt. # 50-3 at 5. Bullard took photos of these messages and one said, "Hey bro I need 300 blues." *Id.* "Blues is a common street term for fentanyl." *Id.*

### III

### DISCUSSION

A.    Legal Standards

The Fourth Amendment protects the right to be free from unreasonable searches or seizures. U.S. Const. Amend. IV. The "touchstone of the Fourth Amendment is reasonableness. The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable." *Florida v. Jimeno,* 500 U.S. 248, 250 (1991)

(citations omitted).  Consequently, where, as here, the defendant moves to suppress evidence obtained during a search, the record must show the search was reasonable.  *United States v. Hawkins*, 249 F.3d 867, 872 (9th Cir. 2001).  Searches conducted without a warrant are "*per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions."  *Id.* (quoting *Minnesota v. Dickerson,* 508 U.S. 366, 372 (1993)).

Washington law similarly proscribes unreasonable searches.  Article I, section 7 of the Washington Constitution provides: "No person shall be disturbed in his private affairs, or his home invaded, without authority of law."  Under article I, section 7, the requisite "authority of law" is generally a search warrant.  *State v. Morse,* 156 Wash.2d 1, 7, 123 P.3d 832 (2005) (citing *State v. Ladson,* 138 Wash.2d 343, 350, 979 P.2d 833 (1999)).  "Warrantless searches are per se unreasonable unless justified by a recognized exception."  *State v. Winterstein*, 167 Wash. 2d 620, 628, 220 P.3d 1226, 1229 (2009) (citing *State v. Hendrickson,* 129 Wash.2d 61, 70, 917 P.2d 563 (1996)).

One of the recognized exceptions to the warrant requirement is the search—in some cases—of those on supervised release.  Under the Fourth Amendment, no warrant is needed to search someone on supervised release who is subject to search conditions when law enforcement has reasonable suspicion that they are engaged in criminal activity.  *United States v. Knights*, 534 U.S. 112, 121 (2001); *see United States v. Cervantes*, 859 F.3d 1175, 1181 (9th Cir. 2017) (those on supervised release have a lower expectation of privacy under the Fourth Amendment than probationers).  Reasonable suspicion is an objective standard considered under the totality of the circumstances.  *Terry v. Ohio*, 392 U.S. 1, 21–22 (1968); *United States v. Job*, 871 F.3d 852, 861 (9th Cir. 2017).  And it exists "when an officer is aware of specific, articulable facts which, when considered with objective and reasonable inferences, form a basis for *particularized* suspicion" of criminal activity.  *United States v. Steinman*, 130 F.4th 693, 709 (9th Cir. 2025) (internal

quotations and citations omitted).  This is not a particularly high threshold and is lower than probable cause.  *Id.*

Similarly, under Washington law, "if there is reasonable cause to believe that an offender has violated a condition or requirement of the sentence, an offender may be required to submit to a search and seizure of the offender's person, residence, automobile, or other personal property." RCW 9.94A.631.  This statute tracks the Fourth Amendment's reasonableness standard.  *United States v. Conway*, 122 F.3d 841, 842 (9th Cir. 1997).  And Washington courts have construed the "reasonable cause" phrase in the statute to mean that law enforcement must have a "well-founded suspicion that a violation has occurred."  *State v. Jardinez*, 184 Wash. App. 518, 524, 338 P.3d 292, 295 (2014) (citing *State v. Massey,* 81 Wash. App. 198, 200, 913 P.2d 424 (1996)).  This requirement is "[a]nalogous to the requirements of a *Terry* stop" and "requires specific and articulable facts" to be considered with "rational inferences."  *Id.* (citing *State v. Parris*, 163 Wash. App. 110, 119, 259 P.3d 331, 336 (2011)) (referring to *Terry,* 392 U.S. at 1).

Washington law requires that when a CCO conducts a search based on "reasonable cause" that a community custody condition has been violated, there must be a "nexus" between the property searched and the alleged violation.  *State v. Cornwell*, 190 Wash. 2d 296, 307, 412 P.3d 1265, 1271 (2018).  This rule aligns with the Fourth Amendment requirement that the scope of a search must be proportionate to the suspicion that instigated it.  *See, e.g.*, *Terry,* 392 U.S. at 30; *Arizona v. Gant*, 556 U.S. 332, 347 (2009); *Riley v. California*, 573 U.S. 373, 402 (2014); *United States v. Grandberry*, 730 F.3d 968, 974 (9th Cir. 2013).

Thus, here, the Government must provide specific, articulable facts and reasonable inferences to justify the warrantless search of Dodd's car, apartment, and cellphone, and there must be a nexus between this property and the suspected violation.  *Cervantes*, 703 F.3d at 1141 ("[T]he government bears the burden of showing that a warrantless search or seizure falls within

ORDER DENYING DEFENDANT'S MOTION TO
SUPPRESS EVIDENCE - 10

an exception to the Fourth Amendment's warrant requirement."). If the Government fails to meet this burden as to any of the searches, the evidence obtained during that search must be suppressed. *Id.* at 1143.

B.     Search of the Car

Officers maintain they had reasonable cause to search the gold Malibu based on the anonymous tip, information obtained during Dodd's polygraph examinations, Dodd's criminal history, and Bullard's "interactions" and "observations" of Dodd after taking responsibility for his case. Dkt. # 50-4 at 8; *see* Dkt. # 50 at 12–14.

But Dodd contends there was no reasonable cause to search the car because the anonymous tip lacked credibility and, under controlling Fifth Amendment precedent, his answers during the polygraph examinations were compelled statements that cannot be used against him. Dkt. # 41 at 8–9, 16–17. He adds that the searches were impermissible because there was no nexus between the property searched and the suspected supervised release violations. *Id.* at 13. And he argues that the search was unconstitutional because officers did not have probable cause to believe he owned or controlled the car before searching it. *Id.* at 11–15.

     1.     Reasonable Cause

          a.     Tip

Dodd relies on *Florida v. J.L.* and *United States v. Mendonsa* to support his argument that the anonymous tip was insufficiently reliable to support Bullard's reasonable cause determination. Dkt. # 54 at 3–4; Dkt. # 64 at 134:22–135:20, 161:2–162:10.

The Supreme Court has said that an anonymous tip, *standing alone*, cannot provide reasonable suspicion to justify a *Terry* stop. In *Florida v. J.L.*, an anonymous caller reported to Florida police officers that a young black man was standing at a certain bus stop wearing a plaid shirt and that he had a gun. 529 U.S. 266, 268 (2000). When officers arrived at the bus stop,

three young black men were there and one, J.L., was wearing a plaid shirt.  *Id.*  Other than the

tip, "the officers had no reason to suspect any of the three of illegal conduct."  *Id.*  When officers

searched J.L., they found a handgun and he was charged under state law for carrying a concealed

firearm without a license and for possessing a firearm while under 18.  *Id.* at 268–69.  The

Supreme Court found the tip lacked the sufficient indicia of reliability to justify the stop because

it "provided no predictive information and therefore left the police without means to test the

informant's knowledge or credibility."  *Id.* at 271.  In fact, "[a]ll the police had to go on in this

case was the bare report of an unknown, unaccountable informant who neither explained how he

knew about the gun nor supplied any basis for believing he had inside information about J.L."

*Id.*  The Court also rejected Florida's argument that the tip was reliable because it accurately

described J.L.'s appearance.  *Id.*  Tips that accurately describe "a subject's readily observable

location and appearance" do not show "that the tipster has knowledge of concealed criminal

activity."  *Id.* at 272.  And this is relevant because the reasonable suspicion at issue "requires that

a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate

person."  *Id.* (internal citation omitted).  So the Court held "an anonymous tip lacking indicia of

reliability . . . does not justify a stop and frisk whenever and however it alleges the illegal

possession of a firearm."  *Id.* at 274.

The Ninth Circuit issued a similar ruling in *United States v. Mendonsa*, 989 F.2d 366 (9th

Cir. 1993).  A Montana police officer relied on a written summary of an anonymous call to

support his request for a search warrant.  *Id.* at 367.  The tipster said they had been at a house and

witnessed various marijuana sales.  *Id.*  The officer verified details provided in the tip and he

learned that the owner of the house, the defendant, was on parole for a prior criminal conviction.

*Id.* at 367–68.  He also included in his affidavit that the marijuana prices quoted by the tipster

accurately reflected market prices.  *Id.* at 368.  Based on the tip and the corroborative evidence in

ORDER DENYING DEFENDANT'S MOTION TO
SUPPRESS EVIDENCE - 12

the officer's affidavit, a warrant was issued and the defendant's house was searched. *Id.* But the court found the warrant unsupported by probable cause because the officer only corroborated "the facts that a man matching the suspect's description lived at the house, that the cars were registered to him, and that there were dogs on the premises." *Id.* at 369. The court reasoned the "mere confirmation of innocent static details is insufficient to support an anonymous tip" because those details do not "provide any indication of criminal activity." *Id.* Instead, the tip must make a "prediction of significant future activity to carry out particular criminal activity" to "provide a reasonable basis for evaluating the validity of an anonymous tip." *Id.* That standard was not met because the officer "merely verified 'innocent' facts; he did not corroborate predictions of future activity." *Id.* at 369.

But those cases do not fit the facts presented here. Unlike these other cases, when the tipster informed police that Dodd "is an aggressive pimp that sells major drugs, such as fentanyl pills and cocaine" and "he carr[ie]s guns multiple at a time," in effect, the tipster predicted Dodd would engage in future criminal activity: promoting prostitution, carrying a firearm after being convicted of a felony, and selling controlled substances. Dkt. 41-2; Dkt. # 50-2 at 2–3; *see* RCW 9A.88.070 (illegal to promote prostitution); RCW 9.41.040 (illegal to possess a firearm after being convicted of a felony); RCW 69.50.410 (illegal to sell controlled substances). In the cases Dodd relies on, the tipster also failed to provide the basis of their knowledge. But here, the tipster intimated they knew about Dodd's activities because they had denied him sex, he raped them, and then he expected them "to turn John's [*sic*] and give him all the money." Dkt. # 41-2. This case is further factually distinct because Bullard did not solely rely on the tip, nor did she rely on the tip simply because it was supported by readily available information. To be sure, she verified the tip accurately provided some publicly available details—Dodd's online usernames and status as a registered sex offender. Dkt. # 50-4 at 8. But she also continued to investigate

and gathered new information that supported the tip's allegations of future criminal activity.  For instance, she visited Dodd's reported residence several times and he was not at home when she dropped in unexpectedly.  *Id.* at 3–5.  During the first polygraph, the polygraph examiner reported Dodd employed countermeasures when asked whether he had sex with anyone other than his approved romantic partner, possessed or handled firearms, and stayed at any unapproved locations.  *Id.* at 6.  And during his second polygraph, the test reflected deceit when Dodd was asked similar questions.  *Id.* at 7–8.

So the tip here predicted Dodd would engage in future criminal activity and the tipster explained how they knew this information.  Bullard then investigated these claims and learned new, non-public information that corroborated many of the allegations.  Thus, it was lawful for Bullard to consider the tip when evaluating the reasonable cause to search and arrest Dodd.

### b.    Polygraph Statements

Dodd also says his compelled statements during the polygraph examinations cannot support a finding of reasonable cause.  He contends that DOC violated its own policy on polygraph testing because it took adverse action against him just because the second exam showed deception.  Dkt. # 41 at 16.  And he says his participation in the polygraph testing violated his Fifth Amendment privilege against self-incrimination.  *Id.* at 17.

The Court concludes that DOC did not violate its polygraph policy.  The policy provides, "No adverse action will be taken solely on the basis of a polygraph test that indicates deception." *Id.* at 16.  And the record shows no adverse action was, in fact, taken only because a polygraph exam reflected deception.  Instead, Dodd was arrested and searched after Bullard says she had reasonable cause to suspect he violated the conditions of his supervised release.  Dkt. # 50-4 at 7–9; Dkt. # 50-6 at 7-9.  Bullard considered that deception was shown in response to questions during the second polygraph, but she also considered several other factors—including Dodd's

use of countermeasures during the first polygraph—before making her reasonable cause

determination. Dkt. # 50-4 at 7–9; Dkt. # 50-6 at 7-9.  Thus, no adverse action was taken only

because Dodd's polygraph test reflected deception and DOC did not violate its polygraph policy.

Nor did Dodd's statements during the polygraph examinations violate his Fifth

Amendment privilege against self-incrimination.  On this point, *United States v. Saechaeo* and

*United States v. Bahr* are instructive.  *See* Dkt. # 41 at 17.

In some cases, probation conditions can penalize the exercise of the Fifth Amendment

and courts have found these sorts of conditions to be unconstitutional.  In *United States v.*

*Saechao*, the defendant pleaded guilty to a state felony and was sentenced to probation.  418 F.3d

1073, 1075 (9th Cir. 2005).  One condition of his probation required him to "promptly and

truthfully answer all reasonable inquiries by the Department of Correction or County Community

Correction Agencies" and another prevented him from possessing firearms.  *Id.*  If he failed to

meet these conditions, it was "grounds for arrest, revocation of probation, or modification of

conditions." *Id.*  But when the defendant first met with his probation officer, he acknowledged

that he still had a hunting rifle in his apartment.  *Id.*  After the probation officer explained the

seriousness of this offense, the defendant turned the rifle over and was not initially arrested.  *Id.*

at 1076.  The probation officer later discussed the case with his supervisor and they decided to

provide federal prosecutors with this evidence.  *Id.*  The defendant was then charged under the

federal statute that prevents felons from possessing a firearm.  *Id.*

The Ninth Circuit upheld the district court's order suppressing the defendant's statements

to his probation officer.  *Id.* at 1081.  The court reached this conclusion because the defendant

was put in a "penalty situation"; that is, his "refusal to answer incriminating questions subjects

him to a penalty" and "the Fifth Amendment is self-executing and any statements made under

threat of such penalty are inadmissible." *Id.* at 1077.  To determine whether a probationer is

subject to a penalty situation, a court "'must inquire whether [his] probation conditions merely required him to appear and give testimony about matters relevant to his probationary status or whether they went further' by taking 'the extra, impermissible step' of requiring him 'to choose between making incriminating statements and jeopardizing his conditional liberty by remaining silent.'" *Id.* at 1078 (quoting *Minnesota v. Murphy,* 465 U.S. 420, 436 (1984)).  The defendant "was compelled by threat of penalty to answer the probation officer's inquiry about firearms" and "the terms of his probation required him to answer *all* reasonable inquiries." *Id.* (internal quotation omitted) (first emphasis removed).

By contrast, the record here shows Dodd was not placed in a penalty situation.  Unlike the defendant in *Saechao*, there is no evidence Dodd's "refusal to answer incriminating questions subject[ed] him to a penalty[.]" *Id.* at 1077.  The conditions of his supervised release required him to "submit to a polygraph examination to be conducted by a polygraph examiner . . . at the discretion of [his] CCO to verify compliance with [his] release conditions." Dkt. # 50-2 at 3.  And he was warned that a "failure to show up for a scheduled polygraph" or "attempts to use countermeasures as determined by the polygraph examiner" could result in sanctions. *Id.*  But Dodd's supervised release conditions do not expressly, or by implication, penalize his right to remain silent. *Saechao*, 418 F.3d at 1079.  Rather, they require him to appear for questions about compliance with his release conditions, which is permissible. *See id.* at 1078.  There is no term of Dodd's supervised release that penalizes him for exercising his Fifth Amendment rights or remaining silent during polygraph testing. *See* Dkt. ## 41-11, 50-2 at 2–3; *United States v. Stoterau*, 524 F.3d 988, 1003 (9th Cir. 2008) (allowing a district court to require polygraph testing as a term of supervised release because the examinee "retains the right to invoke his Fifth Amendment privilege and remain silent.").  So this was not "an attempt by the state 'to attach an impermissible penalty to the exercise of the privilege against self-incrimination'" and Dodd's

statements during the polygraph examination can support a reasonable cause determination. *Saechao*, 418 F.3d at 1081 (quoting *Murphy,* 465 U.S. at 438).

*United States v. Bahr* is similarly distinguishable. There, the defendant was convicted of rape and, as one of the mandatory conditions of his supervised release, he had to complete a sex offender treatment program. 730 F.3d 963, 965 (9th Cir. 2013). As part of this program, he needed to submit to a "full disclosure" polygraph of his sexual history. *Id.* During the test, he revealed that he had sexual contact with several minors and previously sexually abused children, and the government included these admissions in the presentence report. *Id.* The trial court denied the defendant's motion to suppress this evidence. *Id.* But the Ninth Circuit found the use of "compulsory treatment disclosures at sentencing" violated his Fifth Amendment privilege against self-incrimination. *Id.* To establish this sort of violation, the court said that "a person must show '(1) that the testimony desired by the government carried the risk of incrimination . . . and (2) that the penalty he suffered amounted to compulsion.'" *Id.* (quoting *United States v. Antelope*, 395 F.3d 1128, 1134 (9th Cir. 2005)). The court first asked whether "the threat of future criminal prosecution is reasonably particular and apparent." *Id.* at 966 (quoting *Antelope*, 395 F.3d 1134). In this case it was because "Bahr was required to give a full disclosure without a guarantee of immunity, and with specific acknowledgment from his parole officer that crimes would be reported to the district attorney and could be prosecuted." *Id.* To see if the second condition was satisfied, the court next asked "whether the penalty amounted to compulsion by asking whether it was sufficiently coercive and 'more than merely hypothetical.'" *Id.* (quoting *Antelope*, 395 F.3d 1138). The court found this condition was also met because Bahr needed to complete the treatment program or he would face revocation of his supervised release and further incarceration, which amounted to compulsion. *Id.* at 967.

1    But here, Dodd did not face similar threats that violated his Fifth Amendment privilege

2  against self-incrimination.  The threat of future criminal prosecution was not reasonably

3  particular and apparent because the DOC polygraph policy says, "No adverse action will be

4  taken solely on the basis of a polygraph test that indicates deception."  Dkt. # 41 at 16.  This is

5  markedly different from the circumstances in *Bahr*, where there was a "specific acknowledgment

6  from [Bahr's] parole officer that crimes would be reported to the district attorney and could be

7  prosecuted."  *Bahr*, 730 F.3d at 966.  What is more, the DOC polygraph policy does not impose

8  consequences if the examinee exercises their Fifth Amendment rights or remains silent during

9  polygraph testing.  *See* Dkt. # 41-11.  And Dodd, unlike Bahr, did not face revocation of his

10  conditional liberty if he exercised his Fifth Amendment rights or remained silent during a

11  polygraph exam.  Dkt. # 50-2 at 2–3.  Instead, Dodd faced a penalty because (among other

12  reasons) he employed countermeasures during his first polygraph—a practice that is explicitly

13  prohibited in the terms of his supervised release.  *Id.*

14        c.    Totality of the Circumstances

15    Courts must look at the "totality of the circumstances" when reviewing reasonable cause

16  determinations to see if officers had a "particularized and objective basis" to suspect legal

17  wrongdoing.  *United States v. Arvizu*, 534 U.S. 266, 273 (2002).

18    Considering all the circumstances, there was reasonable cause for officers to suspect

19  Dodd was engaged in legal wrongdoing when the car was searched.  At the time of the search,

20  Dodd's second polygraph exam showed deception when he was asked about possessing and

21  handling firearms, sexual contact with anyone other than his approved romantic partner, and

22  spending the night anywhere other than his approved residence.  Dkt. # 50-4 at 7–8.  During his

23  first polygraph test, in the opinion of the polygraph examiner, he used countermeasures when

24  asked similar questions.  *Id.* at 6.  And these results corroborated the allegations Bullard received

ORDER DENYING DEFENDANT'S MOTION TO
SUPPRESS EVIDENCE - 18

in an anonymous tip, including the allegation that Dodd "carr[ie]s guns multiple at a time." Dkt. # 41-2; *see* Dkt, # 50-4 at 8. In addition, Dodd was repeatedly not at home when Bullard dropped in on him unexpectedly and there were no sheets on the bed when she toured his apartment. Dkt. # 50-4 at 3–5. Dodd also ran to both of his polygraph tests and away from his apartment went Bullard visited him, so she suspected he was hiding a vehicle from her. *Id.* at 3–7. Combined with Dodd's criminal history involving firearms and controlled substances, this information was sufficient to create reasonable cause to suspect that Dodd violated the conditions of his supervised release at the time of the search. *Id.* at 8.

> 2.      Nexus

Dodd next relies on *State v. Jardinez* to argue this search was unlawful because there no "nexus" between the car and the suspected criminal violation. Dkt. # 41 at 13.

The court in *Jardinez* limited the bounds of a permissible search under RCW 9.94A.631(1). After the defendant pleaded guilty to a drive-by shooting and unlawful possession of a firearm, he served time in prison and was placed on 18 months of community supervision. *Jardinez*, 184 Wash. App. at 521. During an appointment with his CCO, the defendant emptied his pockets and placed an iPod on a desk. *Id.* The CCO later testified the iPod interested him because "parolees occasionally take pictures of themselves with other gang members or doing something they shouldn't be doing." *Id.* (internal quotations omitted). When the CCO handled the iPod, the defendant appeared nervous but the CCO was unaware of any other facts that suggested the iPod would show evidence of a crime or a violation of the conditions of the defendant's supervised release. *Id.* Still, the CCO accessed the iPod, searched the contents, and found a video of the defendant pumping a shotgun in his apartment. *Id.* The defendant was then arrested for violating the conditions of community custody. *Id.* at 522. But because the CCO testified "he had no evidence to support his search of the device, except for [the defendant]

ORDER DENYING DEFENDANT'S MOTION TO
SUPPRESS EVIDENCE - 19

1    acting nervous, the trial court concluded the search was not proper." *Id.*  And the court of

2    appeals ultimately upheld this decision because the Sentencing Guidelines Commission comment

3    about RCW 9.94A.631(1) says a search or seizure under this law "should relate to the violation

4    which the Community Corrections Officer believes to have occurred." *Id.* at 529.  In a later case,

5    the Washington Supreme Court affirmed this holding and underscored that "[f]or a search to be

6    lawful, there must be a nexus between the property searched and the alleged probation

7    violation." *State v. Cornwell*, 190 Wash. 2d 296, 307, 412 P.3d 1265, 1271 (2018).

8        Unlike the search in *Jardinez*, here there was a nexus between the search of the car and

9    suspected supervised release violation.  When the car was searched, officers suspected that Dodd

10   was in possession of a firearm or controlled substances based on the information they learned

11   during the polygraph examinations, the anonymous tip, and his prior criminal history.  *See* Dkt. #

12   50-3 at 4; Dkt. # 50-4 at 8.  This is unlike the circumstances in *Jardinez*, where the CCO "had no

13   reason to believe [the defendant] possessed a firearm" before the search.  184 Wash. App. at 528.

14   And the car was connected to officers' suspicions because Bullard also believed that Dodd was

15   hiding a vehicle from her.  Dkt. # 50-4 at 7.  It was reasonable for officers to infer that Dodd's

16   evasive behavior with his car was connected to a potential supervised release violation.  Thus,

17   the search of the car was justifiably linked to Dodd's suspected possession of a firearm or

18   controlled substances.

19       3.    Control

20       Dodd's final argument about the search of the car is that it was unlawful because law

21   enforcement did not have probable cause to believe he owned or controlled the car before

22   searching it.

23       When "conducting a warrantless search of a vehicle pursuant to a supervised release

24   condition, law enforcement must have probable cause to believe that the supervisee owns or

ORDER DENYING DEFENDANT'S MOTION TO
SUPPRESS EVIDENCE - 20

controls the vehicle to be searched." *United States v. Dixon*, 984 F.3d 814, 822 (9th Cir. 2020). Probable cause exists when, "under the totality of circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that" the defendant owned or controlled the vehicle to be searched. *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007) (quoting *United States v. Smith,* 790 F.2d 789, 792 (9th Cir. 1986)). While conclusive evidence is not required, "[m]ere suspicion, common rumor, or even strong reason to suspect are not enough." *Id.* (quoting *McKenzie v. Lamb,* 738 F.2d 1005, 1008 (9th Cir.1984)).

Like Dodd, the defendant in *United States v. Dixon* was serving a term of supervised release and subject to a warrantless search condition. 984 F.3d at 816. While on supervised release, officers suspected the defendant was involved in a shooting and put him under surveillance. *Id.* Officers observed the defendant driving both a black BMW and a blue Honda minivan. *Id.* at 817. And when they saw the defendant leaving his apartment with two garbage bags, they went to detain him. *Id.* One officer testified that he saw the defendant walking towards a blue minivan, which the officer had seen the defendant driving. *Id.* After officers detained the defendant, he dropped the garbage bags and a set of keys on the ground. *Id.* The keys were then used to unlock the minivan and a large bag of marijuana was found inside. *Id.* But when the defendant moved to suppress the evidence uncovered during the search, he submitted a declaration that disputed the officers' version of these events. *Id.* He said that he never sat in or owned a black BMW during the relevant period and that an officer repeatedly requested he provide the keys for a black Audi while detained. *Id.* He also claimed that there were two blue minivans parked side-by-side in front of his apartment complex that day, he walked past the blue minivan before being stopped, and officers first tried to enter the other blue minivan before its owner came out of the apartment complex to stop them. *Id.*

1    Based on these disputed facts, the Ninth Circuit found it was not clear that officers first

2   had a sufficient basis to believe the defendant owned or controlled the blue minivan. *Id.* at 818–

3   19. "[P]olice crossed that knowledge threshold only when they inserted the key that [the

4   defendant] had dropped into the car lock, thereby confirming that he exercised control over the

5   minivan." *Id.* at 819. The court then evaluated whether inserting the key into the key lock

6   constituted a search under the Fourth Amendment. *Id.* at 819–21. And the court found that it

7   was a search because it was a physical intrusion "done for the express purpose of obtaining

8   information, specifically to learn whether [the defendant] exercised control over the minivan."

9   *Id.* at 820. This search was ultimately found unreasonable because officers needed probable

10  cause that the defendant either owned or controlled the minivan *before* inserting the key and

11  thereby conducting a search. *Id.* at 823.

12   Several factual differences distinguish the search of the Malibu here from the search of

13  the minivan in *Dixon*. First, Tewolde only saw Dodd driving one vehicle—the gold Malibu—

14  and he only took surveillance photographs of this vehicle. Dkt. # 50-7 at 3–6; Dkt. # 64 at 13:3–

15  17. He then informed other officers that he observed Dodd wearing a black jacket and driving

16  the gold Malibu in the parking lot of the fast-food restaurant shortly before the search. Dkt. # 64

17  at 24:4–13. Video footage later confirmed that Dodd was indeed wearing a black jacket on that

18  day. Dkt. # 50-8. Second, Tewolde relayed the license plate of the vehicle he saw Dodd driving

19  to other officers. Dkt. # 64 at 30:20–31:12. This license plate number matched the license plate

20  of the vehicle that was eventually searched. *Id.* at 10:7–10. The DOC Warrants Desk also

21  emailed officers confirming they ran this license plate through their system before the search,

22  while Dodd was still at the DOC Office. Dkt. # 62 at 72:9–18. Third, there was no other, similar

23  gold car in the parking lot where the search took place. *See* Dkt. # 50-7 at 6. So there was no

24  potential that officers were confused about the specific vehicle Dodd controlled. Fourth, officers

ORDER DENYING DEFENDANT'S MOTION TO
SUPPRESS EVIDENCE - 22

did not try to access any other vehicle before searching the gold Malibu or demand that Dodd provide them access to any other vehicle. *See* Dkt. # 64 at 48:4–50:3. In combination, these differences do not mean the officers were sure that Dodd controlled the car—to the contrary, they never saw him park or exit the vehicle—but the available evidence shows the officers met the probable cause standard before the search. That is, the facts available to the officers showed there was a fair probability that Dodd controlled the gold Malibu, so it was reasonable for them to conduct a search.

In sum, Dodd was on supervised release and subject to a warrantless search condition. Officers had reasonable cause to suspect he breached the terms of his community custody before searching the car, and there was a nexus between the property searched and the suspected violations. Officers also had probable cause to suspect Dodd controlled the vehicle they searched. So the Government has presented sufficient evidence to show the warrantless search of the car was reasonable and lawful.

C.    Search of the Apartment and Cellphone[6]

1.    Reasonable Cause

The same reasonable cause standard that applies to the search of the car applies to the search of Dodd's apartment and cellphone because the terms of his supervised release permit the warrantless search of this property too. Dkt. # 50-2 at 2–3. Officers had reasonable cause to

---

[6] Dodd also challenges the warrant application submitted for the search of the cellphone because it contains a misstatement of fact. Dkt. # 41 at 13–14. But he does not argue this misstatement was made intentionally or recklessly, nor does he say this misstatement was necessary to a finding of probable cause. *Id.*; *see United States v. Perkins*, 850 F.3d 1109, 1116 (9th Cir. 2017) (to invalidate a warrant, "the defendant must establish two things by a preponderance of the evidence: first, that 'the affiant officer intentionally or recklessly made false or misleading statements or omissions in support of the warrant[,]' and second, that the false or misleading statement or omission was material, i.e., 'necessary to finding probable cause.'") (quoting *United States v. Martinez–Garcia*, 397 F.3d 1205, 1214–15 (9th Cir. 2005)). At the evidentiary hearing, the FBI officer who prepared the warrant application testified that he did not intentionally make this misstatement. Dkt. # 64 at 94:23–95:3.

ORDER DENYING DEFENDANT'S MOTION TO
SUPPRESS EVIDENCE - 23

search Dodd's apartment and cellphone after they found a handgun and suspected fentanyl pills in his car. Dkt. # 50-3 at 4–5. When combined with the fact that Dodd was not at home at the times Bullard dropped in on him unexpectedly, the information that officers learned during Dodd's polygraph examinations, Dodd running to his polygraph tests and away from his apartment, the absence of sheets on the bed when Bullard toured Dodd's apartment, the anonymous tip, and Dodd's criminal history, it was reasonable for officers to suspect they would find additional evidence of supervised release violations in these locations.

2.    Nexus

There was similarly a nexus between this property and the suspected supervised release violations. It was reasonable for officers to suspect Dodd was selling controlled substances, not residing at an approved location, and was engaging in romantic or sexual relationships that had not been approved by his CCO based on the handgun and suspected fentanyl pills found in his car, the anonymous tip, the fact that Dodd was repeatedly not at home when Bullard dropped in on him unexpectedly, and the information officers learned during Dodd's polygraph exams. A search of his apartment and cellphone is closely tied to these suspected violations. So these searches were directly linked to the suspicion that instigated them.

All in all, these searches were reasonable too. Dodd was subject to warrantless searches of his apartment and cellphone, and officers had reasonable cause to suspect he was violating the conditions of his community custody before searching this property. The scope of these searches was proportionate and linked to the suspected violations.

D.    Stalking Horse

A probation search may not be performed in lieu of a criminal investigation. *See Latta v. Fitzharris,* 521 F.2d 246, 249 (9th Cir.) (en banc). So a "probation officer acts as a stalking horse if he conducts a probation search on prior request of and in concert with law enforcement

officers." *United States v. Watts*, 67 F.3d 790, 794 (9th Cir. 1995), *cert. granted, judgment rev'd on other grounds*, 519 U.S. 148 (1997) (citing *United States v. Richardson,* 849 F.2d 439, 441 (9th Cir. 1988)); *Smith v. Rhay,* 419 F.2d 160, 162–63 (9th Cir. 1969). But collaboration between a police officer and probation officer does not automatically render a probation search unlawful. *Watts*, 67 F.3d at 794. And a "probation officer does not act as a stalking horse if he initiates the search in the performance of his duties as a probation officer." *Id.* (internal citations omitted).

Dodd claims DOC acted as a stalking horse for the King County Sheriff's Office. Dkt. # 41 at 18–19. The sheriff's office allegedly "enlisted the Department of Corrections to conduct their investigation, knowing that since Mr. Dodd was on DOC supervision, the probable cause requirement did not apply." *Id.* at 19. Yet the only evidence he provides to support this argument is that Bullard received an anonymous tip about Dodd from law enforcement and a Seattle Police Department officer accompanied Bullard to Dodd's apartment. Dkt. # 54 at 6. This threadbare evidence does not show DOC performed a search to evade the warrant requirement, or that other law enforcement agencies requested DOC to perform a search on its behalf. *United States v. Jarrad*, 754 F.2d 1451, 1454 (9th Cir. 1985) ("Parole and law enforcement officials frequently cooperate in the course of their work."); *see* Dkt. # 62 at 97:15– 21; Dkt. # 64 at 124:22–25.

//

//

//

//

//

//

ORDER DENYING DEFENDANT'S MOTION TO
SUPPRESS EVIDENCE - 25

## III

### CONCLUSION

For the above reasons, the Court DENIES Defendant's Motion to Suppress. Dkt. # 41.

Dated this 9th day of May, 2025.

John H. Chun
United States District Judge